**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**JEMAL'S BOULEVARD, LLC,**

               **Plaintiff,**

v.

                                                     **22-CV-193-JLS(HKS)**

**DICK'S SPORTING GOODS, INC.,**

               **Defendant.**

## REPORT, RECOMMENDATION, AND ORDER

This case was referred to the undersigned by the Hon. John L. Sinatra, Jr., pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. #10. Plaintiff brings this action for defendant's alleged breach of contract arising out a commercial lease.

Currently before the Court is defendant's motion for summary judgment. Dkt. #36. For the following reasons, it is recommended that the motion be denied. It is further recommended that, because there are no triable issues of fact, defendant be ordered to show cause why summary judgment should not be granted to plaintiff on its breach of contract claim.

## BACKGROUND

### *The Boulevard Mall Lease*

Defendant Dick's Sporting Goods, Inc. ("DSG") is a national retailer of sporting goods. Dkt. #36-1, ¶ 1; Dkt. #39-1, ¶ 1.

On December 19, 2014, DSG entered into a lease for retail space in a shopping center known as the Boulevard Mall in Amherst, New York. Dkt. #36-1, ¶ 2; Dkt. #39-1, ¶ 2; Dkt. # 36-3. The lease was executed between DSG and Boulevard Mall SPE, LLC, the then-owner of the shopping center. Dkt. #36-1, ¶ 3; Dkt. #39-1, ¶ 3.

On June 27, 2019, Plaintiff, Jemal's Boulevard, LLC ("Jemal's"), purchased the shopping center and became a successor to the lease. Dkt. #36-1, ¶¶ 5-6; Dkt. #39-1, ¶¶ 5-6.

Several provisions of the lease are at issue in this matter. First, Section 3.6, titled "Landlord's Construction Representations,"[1] states, in part:

> Landlord further agrees that if, at any time, any government or quasi-governmental entity or insurance rating bureaus having jurisdiction shall determine that the Shopping Center, including Landlord's Work, shall not have been performed or constructed or Landlord's operation of the Shopping Center is not in compliance with any Legal Requirements or insurance rating standard and shall request compliance with the same or if Landlord's failure to comply shall in any way adversely affect the use of the Demised Premises . . . then Landlord shall, upon receipt of notice of such complaint, or determination of non-compliance, promptly, at its sole cost and expense, cause such repairs, alterations or other work to be done or action to be taken so as to bring about the compliance requested and/or otherwise eliminate the adverse effect upon Tenant. **If by reason of such failure of compliance or by reason of such repairs, alterations or other work done by Landlord, Tenant**

---

[1] Section 17.12 of the lease states that headings and captions in the lease "are used only as a matter of convenience for reference and are not to be considered a part of this Lease or used in determining the intent of the Parties to this Lease." Dkt. #36-3, p. 74.

> **shall be deprived of the use or enjoyment of the whole or any part of the Demised Premises or the Common Areas, all Rent, Substitute Rent or Co-Tenancy Rent shall abate on a per diem basis in proportion to such deprivation. Further, if at any time the applicable zoning and other applicable laws shall not permit the retail sale of any and all types of wearing apparel, sporting goods or hunting equipment. . . in the Demised Premises, then, in addition to the aforesaid Rent abatement, Tenant. . . may terminate this Lease.**

Dkt. #36-3, pp. 42-43 (emphasis added).

Second, Section 16.4, "Use of the Demised Premises," states:

> Tenant agrees that after the Required Occupancy Period, the Demised Premises shall be used for any retail purpose or no purpose. Tenant further agrees that the Demised Premises shall not be used for any use which violates any restriction or exclusive use shown on <u>Exhibit I</u> which Landlord has granted to another Occupant in the Shopping Center prior to the execution of this Lease and such restriction or exclusive [use] is applicable to the Demised Premises (during the period such restriction or exclusive use is operative). **Notwithstanding anything herein, Landlord agrees that the Demised Premises shall not be restricted during the term of this Lease from the sale of health, fitness and/or exercise equipment, sporting goods and sporting equipment, apparel or footwear.**

Dkt. #36-3, p. 69 (emphasis added).

The lease also contains a "Force Majeure" clause, defining "force majeure" as "any act or event that wholly or partially prevents the affected Party from performing any of its obligations **(other than the payment of money)** if such act or event is beyond the reasonable control and does not arise out of the negligent act or omission of the

~ 3 ~

affected Party to perform such obligation or comply with such condition." Dkt. #36-3, p. 70 (emphasis added). This clause extends the affected party's time to perform certain obligations under the lease. *Id.*

Next, Section 17.16, "Representations and Warranties," sets forth certain warranties by plaintiff related to DSG's "use of the Demised Premises for the sale of health, fitness and/or exercise equipment, clothing, sporting goods, sporting equipment, and casual and athletic footwear." Dkt. #36-3, p. 75. Specifically, this provision states that the property is zoned to allow for this intended use and, "as of the date of this Lease," DSG's use of the common areas, parking, and signage "contemplated by this Lease shall not be prevented or materially impaired by any current zoning, building, health, safety, environmental or other governmental law or regulation, or by any restriction, covenant, lease or agreement entered into, whether of record or not." Dkt. # 36-3, p. 75 (emphasis added).

Section 17.16 further states:

> **If, at any time, any representation or warranty made by Landlord herein proves to be incorrect or there is a breach or default of any of Landlord's representations, warranties, covenants or agreements** under this Section 17.16 or elsewhere in this Lease which results in deprivation or impairment in any material respect in the use and enjoyment of the Demised Premises, **or if, for any other reason, Tenant shall be deprived of or impaired in the use and enjoyment of the Demised Premises and Common Areas as herein provided, the Rent to be paid by Tenant shall be equitably abated during such period.** If such period continues for more than thirty (30) days after notice from Tenant and such

>additional period as is reasonably necessary to cure same so long as Landlord is pursuing with due diligence, but no longer than ninety (90) days, Tenant may, at its option, terminate this Lease by notice to Landlord while reserving all rights which Tenant may have for Landlord's breach of this Lease, including the right to monetary damages.

Dkt. # 36-3, p. 76 (emphasis added).

Finally, the lease provides that any prevailing party in litigation arising out of a default under the lease shall be entitled to recover its reasonable attorney's fees from the non-prevailing party. Dkt. # 36-3, p. 76.

### *The COVID-19 Pandemic*

Beginning in January 2020, the federal government and World Health Organization issued public health emergencies due to the COVID-19 pandemic, and state and federal government agencies begin issuing mandates and recommendations to individuals and businesses. Dkt. #36-1, ¶ 16; Dkt. #39-1, ¶ 16.

In March 2020, New York issued several Executive Orders pertaining to COVID-19. Dkt. #36-4. On March 7, New York issued Executive Order 202, which declared a "Disaster Emergency" in the state due to COVID-19. Dkt. #36-1, ¶ 17; Dkt. #39-1, ¶ 17. On March 18, New York issued Executive Order 202.6, which required all non-essential businesses to reduce their in-person workforces by at least 50%, effective March 20, 2020. Dkt. #36-1, ¶ 18; Dkt. #39-1, ¶ 18. Finally, on March 20, New York issued

Executive Order 202.8, which required all non-essential businesses to reduce their in-person workforces by 100%, effective March 22, 2020. Dkt. #36-1, ¶ 19; Dkt. #39-1, ¶ 19.

DSG was classified as a non-essential retail business under New York Executive Orders 202.6 and 202.8 and was thus prohibited from allowing customers inside their stores. Dkt. #36-1, ¶¶ 20-21; Dkt. #39-1, ¶¶ 20-21. Shopping centers like Boulevard Mall were also required to close under the Executive Orders. Dkt. #36-1, ¶ 23; Dkt. #39-1, ¶ 23.

DSG's store at the shopping center was closed to in-store shoppers from March 19, 2020 through June 3, 2020 (the "Closure Period"). Dkt. #36-1, ¶¶ 25, 33, 35-36; Dkt. #39-1, ¶¶ 25, 33, 35-36. However, customers could use DSG's "buy-online, pick-up in store" ("BOPIS") option and pick up their purchases curbside. Dkt. #36-1, ¶¶ 37-38, 40-41; Dkt. #39-1, ¶¶ 37-38, 40-41.

The DSG store is normally open seven days a week: 9:00 a.m. to 9:30 p.m. Monday to Saturday and 10:00 a.m. to 7:00 p.m. on Sunday. Dkt. #36-1, ¶ 48; Dkt. #39-1, ¶ 48. Prior to the COVID-19 pandemic, DSG had on average seventy-five employees at the Boulevard Mall store, with eighteen working at any given time. Dkt. #36-1, ¶ 51; Dkt. #39-1, ¶ 51.

During the Closure Period, curbside pick-up was available only five days a week from 9:00 a.m. to 5:00 p.m., which later increased to seven days a week, and in mid-

May the hours were extended. Dkt. #36-1, ¶ 49; Dkt. #39-1, ¶ 49. Based on CDC guidelines, DSG was permitted to have only five employees inside the store at any given time. Dkt. #36-1, ¶ 50; Dkt. #39-1, ¶ 50.

On March 19, 2020, DSG sent plaintiff a "Force Majeure Notice." Dkt. #36-9; Dkt. # 36-1, ¶ 53; Dkt. #39-1, ¶ 53. This letter stated, in part:

> The COVID-19 (Coronavirus) Pandemic constitutes a force majeure event. As such, any store closures resulting from or in response to the COVID-19 (Coronavirus) Pandemic are permitted under the terms of the Lease and any sunsets on DSG's leasehold rights are tolled during the period of such closure. We continue to monitor the status of the situation and will do our best to provide further details as they become available.

Dkt. # 36-9.

### *The Rent Dispute Arises*

On March 27, 2020, DSG sent plaintiff a letter titled "Notice Regarding Rent." Dkt. # 36-10; Dkt. # 36-1, ¶ 54; Dkt. #39-1, ¶ 54. The letter stated that, based on the "language of our lease, and our rights at law and equity," DSG had the right to abate all rent beginning on the date its store closed due to COVID-19. Dkt. #36-10, p. 2.

On April 9, 2020, plaintiff's leasing and management company responded to DSG's notice. Dkt. #36-11. The letter noted the difficulties created by the pandemic but stated: "We expect that all parties will continue to abide by the terms of the Lease,

~ 7 ~

including payment of rent, and we respectfully reserve all of our rights and remedies for any failures to do so." Dkt. #36-11, p. 2.

On April 14, 2020, plaintiff's agent sent DSG a "Notice of Default" demanding payment of $69,534.40 in overdue rent for the Boulevard Mall DSG store. Dkt. # 36-12.

On June 3, 2020, New York announced that non-essential retail businesses could resume in-store shopping. Dkt. #36-1, ¶ 26; Dkt. #39-1, ¶ 26. DSG reopened its store to the public on June 4, 2020. Dkt. #36-1, ¶ 27; Dkt. #39-1, ¶ 27.

On July 8, 2020, plaintiff's agent sent DSG another "Notice of Default" demanding immediate payment of $139,068.80 in overdue rent. Dkt. #36-13. On July 29, 2020, DSG responded to the notices of default, asserting that it was entitled to equitable abatement of its rent during the Closure Period, citing Sections 3.6 and 17.16 of the lease. Dkt. # 36-14.

On January 27, 2021, plaintiff's counsel sent DSG a formal "Notice of Default" letter demanding payment of $139,068.80 in overdue rent, noting that absent payment, plaintiff could file a lawsuit and that the lease provided for the recovery of attorney's fees and costs in such an action. Dkt. # 36-15.

DSG's counsel responded on February 11, 2021, reasserting DSG's view

that it was entitled to abate its rent under the lease during the Closure Period and that it was owed reimbursement of $48,815.28 for amounts it overpaid for that period.   Dkt. # 36-16.

Plaintiff filed this action on March 9, 2022, alleging that defendant breached the lease by failing "to make regular monthly payments and other payments due under the Lease." Dkt. #1, ¶ 7. On May 5, 2022, DSG filed an Answer and Counterclaim denying that it breached the lease and asserting several affirmative defenses: failure of conditions precedent; unclean hands; accord and satisfaction; prior breach by plaintiff; frustration of purpose; and impossibility. Dkt. #9.

DSG counterclaims for a declaratory judgment that it was entitled to abate its rent during the closure period; that it is not in default under the lease; and that it is entitled to reimbursement of $48,815.28. Dkt. #9, pp. 9-10. Plaintiff filed an answer to the counterclaim on May 25, 2022, denying its operative allegations and asserting various affirmative defenses. Dkt. #14.

## ANALYSIS

### *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "In reaching this determination, the

court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party." *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

### **_Breach of Contract_**[2]

"To state a breach of contract claim under New York law, a plaintiff must show (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Delshah 60 Ninth, LLC v. Free People of PA, LLC*, CIVIL ACTION NO. 20 Civ 5905 (JMF) (SLC), 2022 WL 4228213, at *12 (S.D.N.Y. June 29, 2022), *report and recommendation adopted as modified by* 2022 WL 3536133 (S.D.N.Y. Aug. 17, 2022).

"Under New York law, if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Gap Inc. v. Ponte Gadea New York LLC*, 524 F. Supp.3d 224, 231 (S.D.N.Y. 2021) (citation and internal quotations omitted). "If, however, the intent of the parties can[not] be ascertained from the face of their agreement, the contract is ambiguous and its interpretation presents a question of fact." *Id.*

"A contract is ambiguous if its language is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Delshah*, 2022 WL 4228213, at *12 (citation and internal quotations omitted). "Whether contract language is ambiguous is a question of law that is resolved by reference to the contract alone." *Id.*

---

[2] The lease does not contain a choice-of-law provision, but both parties rely on New York law.

~ 11 ~

"Moreover, it is a well-established principle of New York contract law that a contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *Id.* at *13. The Court thus must examine the language of the lease as a whole," and "in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." *Id.*

In all respects, DSG's motion for summary judgment turns on whether the lease allowed DSG to abate its rent during the period its store at the Boulevard Mall was closed due to COVID-19.

### ***Section 3.6 of the Lease***

DSG first relies on Section 3.6 of the lease which provides, in part, that DSG is entitled to equitable abatement of its rent where it is "deprived of the use or enjoyment of the whole or any part of the Demised Premises or the Common Areas." Dkt. #36-3, p. 43.

DSG's reliance on this section is misplaced, however, because it ignores the antecedent requirement that such deprivation be caused by (1) plaintiff's failure to comply with governmental or insurance-related legal requirements or standards, or (2) "repairs, alterations or other work done by Landlord" to bring the property into compliance with such requirements or standards. Dkt. #36-3, pp. 42-43. DSG points to no evidence that the COVID-19 pandemic fits within those parameters.

DSG next invokes another part of Section 3.6 which states:

> Further, if at any time the applicable zoning and other applicable laws shall not permit the retail sale of any and all types of wearing apparel, sporting goods or hunting equipment. . . in the Demised Premises, then, in addition to the aforesaid Rent abatement, Tenant. . . may terminate this Lease.

Dkt. #36-3, p. 43. This too is unavailing because DSG points to no laws targeting the type of products sold by DSG. Rather, the COVID-19 closures were the result of Executive Orders of general applicability to all businesses deemed non-essential.

Plaintiff thus correctly notes that DSG's extraction of a single sentence from Section 3.6 ignores the meaning of the clause as a whole. This interpretation is bolstered by the fact that the clause bestows a right on the tenant not only to abate its rent, but to terminate the lease, should such a law come to pass. This makes sense because, if sporting or hunting goods or apparel could not lawfully be sold at the Boulevard Mall, DSG would have no reason to lease space there.

### ***Section 17.16 of the Lease***

Plaintiff next relies on Section 17.16 of the lease.

By its terms, the first part of this section is premised on a breach by plaintiff of any of its representations or warranties which impairs DSG's use and enjoyment of the premises. Dkt. #36-3, p. 76. DSG concedes this in its reply brief. Dkt. #40, p. 10 ("First there must be a representation or warranty of Landlord that is incorrect (or has been

~ 13 ~

breached).")." Yet DSG does not say how the COVID-19 closures were the product of any breach by plaintiff of its warranties or representations.

Instead, DSG relies on other language in Section 17.16 which states: "[O]r if, for any other reason, Tenant shall be deprived of or impaired in the use and enjoyment of the Demised Premises and Common Areas as herein provided, the Rent to be paid by Tenant shall be equitably abated during such period." Dkt. #36-3, p. 76.

In isolation, this language seems helpful to DSG, but its interpretation does not comport with the provision as a whole. Section 17.16 deals generally with the landlord's representations and warranties and, immediately following the language on which DSG relies, it expressly provides an opportunity for the landlord to cure any impairment in DSG's enjoyment or use of the premises:

> **If such period continues for more than thirty (30) days after notice from Tenant and such additional period as is reasonably necessary to cure same so long as Landlord is pursuing with due diligence**, but no longer than ninety (90) days, Tenant may, at its option, terminate this Lease by notice to Landlord while reserving all rights which Tenant may have for Landlord's breach of this Lease, including the right to monetary damages.

Dkt. #36-3, p. 76 (emphasis added). This language would be rendered meaningless if the preceding sentence were interpreted to encompass impairment of use caused by something outside the scope of the landlord's warranties or representations, or things outside of its control. Such a contract interpretation is strongly disfavored under New York law. *Delshah*, 2022 WL 4228213, at *13 ("[A]n interpretation of a contract that has the

~ 14 ~

effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (citation and internal quotations omitted).

That this section deals with things that are within the landlord's control—or things that it has undertaken to represent or warranty—is supported by the fact that the lease incudes another provision that deals with things that the parties *cannot* control: the force majeure clause. Dkt. #36-3, p. 70. While the Court understands that DSG disavows any reliance on that clause for its rent-abatement argument, the clause is still relevant inasmuch as the Court's task is to interpret the language of the lease as a whole. *Delshah*, 2022 WL 4228213, at *13.[3]

The Court thus finds that the lease provisions on which DSG relies to support its non-payment and/or abatement of rent for the Closure Period are unambiguous and do not support its interpretation of the lease.

It will thus be recommended that DSG's motion for summary judgment be denied.

Further, because the Court finds there to be no triable issues of fact as to the meaning of the relevant lease provisions, it will also be recommended that DSG show cause why summary judgment should not be entered in plaintiff's favor as to its breach of contract claim, notwithstanding that plaintiff did not file a cross-motion for summary

---

[3] The force majeure clause does not excuse or abate "the payment of money." Dkt. #36-3, p. 70.

judgment. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000) (court may grant summary judgment for party absent motion where the materials before the court "show that no material dispute of fact exists and the other party is entitled to judgment as a matter of law").

## CONCLUSION

For the foregoing reasons, it is recommended that defendants' motion for summary judgment (Dkt. #36) be denied.

It is further recommended that DSG be required to show cause why summary judgment should not be granted to plaintiff on its breach of contract claim.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been but were not presented to the

...

magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

DATED:   Buffalo, New York
November 13, 2023

 s/ H. Kenneth Schroeder, Jr.
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**